(May 29, 1924.)

THE CONTINENTAL NATIONAL BANK OF SALT LAKE CITY, a Corporation, Respondent, v. ARTHUR NAYLOR, Defendant, and LORIN C. WOOLLEY, Intervenor and Appellant.

[228 Pac. 266.]

LIVESTOCK LEASE—RECORDING—CREDITOR OF LESSEE.

A creditor of the lessee, as that term is used in C. S., sec. 1955, is a creditor who holds a lien by attachment or otherwise on the livestock claimed to be under lease, and not a general creditor.

APPEAL from the District Court of the Fifth Judicial District, for Bannock County. Hon. Robert M. Terrell, Judge.

Action on promissory notes. Judgment for plaintiff. Intervenor appeals. *Reversed.*

P. C. O'Malley, for Appellant.

Only a creditor who has acquired a lien upon the mortgaged property by virtue of some legal proceedings or who is

armed with some process authorizing a seizure of the property can question the compliance with C. S., sec. 1955. A mere creditor at large, without some process for the collection or enforcement of his debt, cannot question the sufficiency of the mortgage which is valid between the parties thereto. (*Lemon v. Wolfe,* 121 Cal. 272, 53 Pac. 801; *Hauslett v. Harrison,* 105 U. S. 401, 26 L. ed. 1075; *Gregory v. Morris,* 96 U. S. 619, 24 L. ed. 740.)

The voluntary delivery by the mortgagor, and the taking possession by the mortgagee, takes the place of recording, and cures other defects in the mortgage, and when so taken the mortgagee holds the property against subsequent attaching creditors. (*Martin v. Holloway,* 16 Ida. 513, 102 Pac. 3, 25 L. R. A., N. S., 110; *Kettenbach v. Walker,* 32 Ida. 544, 186 Pac. 912; *Hammond Motor Co. v. Warren,* 113 Kan. 576, 213 Pac. 810; *Feigle v. First Nat. Bank,* 90 Okl. 26, 214 Pac. 181; *York Mfg. Co. v. Cassell,* 201 U. S. 343, 26 Sup. Ct. 481, 50 L. ed. 782.)

The word "creditor" as used in C. S., sec. 1955, means a "lien creditor." (*Meyer v. Western Car Co.,* 102 U. S. 59, 26 L. ed. 59.)

A general creditor is not within the protection of a recording act, protecting subsequent purchasers, encumbrancers and creditors in good faith and for value, though some acts expressly extend protection to subsequent simple creditors. (23 R. C. L., sec. 117, p. 250; *Campbell v. Remaly,* 112 Mich. 214, 67 Am. St. 393, 70 N. W. 432; *Davis v. Owenby,* 14 Mo. 170, 55 Am. Dec. 105; *Vellely v. Grafton First Nat. Bank,* 14 N. D. 580, 116 Am. St. 700, 106 N. W. 127, 5 L. R. A., N. S., 387; *Massey v. Wescott,* 40 Ill. 160; *McFadden v. Worthington,* 45 Ill. 362; *Loughridge v. Boland,* 52 Miss. 546; *Berky & Gay Furniture Co. v. Sherman Hotel Co.,* 81 Tex. 135, 16 S. W. 807; *Farmers & Merchants' Bank v. Anthony,* 39 Neb. 343, 57 N. W. 1029; *Union National Bank v. Oium,* 3 N. D. 193, 44 Am. St. 533; 54 N. W. 1034; *Milton v. Boyd,* 49 N. J. Eq. 142, 22 Atl. 1078; *Karse v. Gane,* 136 N. Y. 316, 32 N. E. 1073; *Reiss v. Argubright,* 3 Neb. (Unof.) 756, 92 N. W. 988; *Eason v. Garrison,* 36

Tex. Civ. App. 574, 82 S. W. 800; *Nauman Co. v. Bradshaw*, 193 Fed. 350, 113 C. C. A. 274; *Youngberg v. Walsh*, 72 Kan. 220, 83 Pac. 972.)

Jones, Pomeroy & Jones, for Respondent.

When we take into consideration the object and purpose of the legislature in enacting section 1955 we are convinced that it was the intention of the legislature to protect creditors against just such a situation as has arisen in the instant case.   The stock industry in this state is one of its greatest resources, and credit is constantly being extended to stock-growers for the development of their resources without security in reliance that the party to whom such credit is extended has no secret liens upon such property.

There is nothing in the statute which in any manner indicates that it was the intent of the legislature that the word "creditor" should be limited to only such creditor or creditors who had a specific lien on the property before the lease was filed or the property taken back.   To so hold would be doing violence to the plain, unambiguous language of the statute.   (*Hare v. Young*, 26 Ida. 682, 146 Pac. 104; *Ruggles v. Cannedy*, 127 Cal. 290, 53 Pac. 911, 59 Pac. 827, 46 L. R. A. 371; *Hopper v. Keys*, 152 Cal. 488, 92 Pac. 1017; *First Nat. Bank of Rock Springs v. Ludvigsen*, 8 Wyo. 230, 80 Am. St. 928, 56 Pac. 994, 57 Pac. 934; *Volker Lumber Co. v. Utah & Oregon Lumber Co.*, 45 Utah, 603, Ann. Cas. 1917D, 1158, 148 Pac. 365; *Noyes v. Brace*, 8 S. D. 190, 65 N. W. 1071; *Stich v. Pirkl*, 100 Misc. 594, 166 N. Y. Supp. 440; *Skilton v. Codington*, 185 N. Y. 80, 113 Am. St. 885, 77 N. E. 790; *National Bank of Bakersfield v. Moore*, 247 Fed. 913; *In re Hansen*, 268 Fed. 904; *Wagar v. Roaser*, 199 App. Div. 130, 190 N. Y. Supp. 677; *Harrison v. South Carthage Mining Co.*, 95 Mo. App. 80, 68 S. W. 963; *Pierson v. Hickey*, 16 S. D. 46, 91 N. W. 339; *Hardin v. Bank of Centralia*, 177 Mo. App. 44, 163 S. W. 306.)

DUNN, J.—On December 29, 1920, respondent brought an action against defendant Naylor on three promissory notes

aggregating $20,000. Writ of attachment was issued on the same day, and on December 30, 1920, the sheriff of Bannock county levied on 1,381 head of sheep as the property of defendant Naylor. Loren C. Woolley on January 12, 1921, filed his complaint in intervention, alleging his ownership of the sheep attached by the sheriff, his service upon the sheriff of written notice of ownership and demand for the return of said sheep to him, the demand by the sheriff and the giving by respondent of an indemnity bond in the sum of $15,000, and the sheriff's refusal to deliver the sheep to intervenor, the delivery of 1,450 sheep to defendant Naylor in October, 1908, by the intervenor and his father, John W. Woolley, under a contract by which Naylor was to run said sheep and pay therefor a certain amount of wool each year and certain increase for each 100 head of sheep, and the relinquishment on December 14, 1920, by said Naylor to intervenor of all claim to said sheep and the repossession of said sheep on said last-named date. The intervenor alleged the value of the sheep attached to be at least $15,000, and judgment for that sum is prayed for, or that he be given immediate possession of the sheep.

Respondent answered the complaint in intervention, denying the material allegations thereof and denying that the sheep in controversy were of the value of "at least fifteen thousand dollars ($15,000), or any sum in excess of ten thousand dollars ($10,000)." As a further answer and separate defense, respondent alleged the bringing of its suit against Naylor on December 29, 1920, to recover judgment on three promissory notes aggregating $20,000, besides interest and attorney's fees; that said indebtedness was then due, and that respondent at the times mentioned in said notes and for a long time prior thereto, and at all times since, was a creditor of said Naylor in good faith and for value, and was such on the date of the attachment of said sheep; that respondent in making loans to the defendant, represented by said promissory notes, nine of which have been paid, believed and relied upon the fact that the said defendant was the owner of the sheep which are the sub-

ject of this attachment; that if the intervenor had any interest in or to said sheep or any sheep at the time said loans were made or for a long time prior thereto or subsequent thereto the said intervenor should not be permitted to claim any title to or interest in said sheep, for the reason that during all the times that respondent made loans to the defendant the sheep mentioned in the complaint in intervention were in the possession and under the control of defendant, with all the indicia of ownership, and that the defendant in the usual course of business made application to respondent for credit without any notice or knowledge by respondent of intervenor's claim to said sheep, and further, that the intervenor had failed and neglected to record in the state of Idaho the lease under which he claimed the defendant held the sheep claimed by the intervenor; that the respondent did not know at the time it became a creditor of said defendant, or at any time, until December 14, 1920, that the intervenor claimed any title to or interest in said sheep and had no means of knowing that he did so claim, and relying upon the possession and ownership and apparent ownership of said defendant and being induced thereby did make the loans described in its complaint and did pay over to said defendant the sums of money evidenced by said promissory notes. For a further defense respondent alleged that if the intervenor had a lease upon any sheep which were in the control and possession of defendant, said lease did not cover the sheep taken under the attachment in this case.

Pursuant to stipulation between the parties by their respective counsel, the case between respondent and intervenor, who is appellant here, was tried before the court without a jury. Findings of fact and conclusions of law were made by the court, and judgment entered in favor of respondent. Appellant moved for a new trial, which was denied, and an appeal was taken from the judgment and the order denying a new trial.

Appellant assigns a large number of errors, but we think the case can be decided without an examination of these in detail.

The evidence shows without dispute that John W. Wooley, the father of appellant, entered into an agreement with defendant Naylor in Utah on October 20, 1908, by which Naylor leased from Woolley and Woolley delivered to Naylor 1,450 head of sheep. Said lease was for the term of one year, and provided that the lessee should keep the number and kind of sheep good, and deliver the same, or an equal number of as good sheep of the same kind, quality and condition to Woolley at the end of the said term or at the end of any term during which he might keep them. It is further provided that Naylor should deliver to Woolley for each year that the agreement might be in force eight head of lambs for each 100 head of sheep, and that he should deliver to Woolley each year at shearing time, at the place where he might sell his wool, one and one-half pounds of wool, or the cash therefor, for each head of said sheep, and also one and one-half pounds of wool for each of the eight lambs for each 100 head of sheep when the lambs should become one year old. The contract also forbade Naylor to dispose of any of the sheep or their increase without first obtaining written consent of Woolley. It also provided that the agreement should be canceled and determined at any time if Woolley should be dissatisfied with the manner in which the sheep, their increase or wool, was being handled. It also provided a method by which, at the expiration of the contract, the sheep to which Woolley would be entitled might be separated from the remainder of the flock, but in case there should not be a sufficient number of sheep in the herd to satisfy Woolley's claim, provision was made that the number should be made up by substituting other sheep as good. So far as the record shows, no sheep were added to the number originally received from Woolley, but the rental was each year paid according to contract except for the year 1920. Nothing in the nature of a final settlement was ever had between the parties until the sheep were turned over to Woolley on December 14, 1920. At that time Woolley received from Naylor the following letter:

"Bountiful, Utah, Dec. 10th, 1920.

"John W. Woolley:

"Dear Uncle: I am sorry to say my business affairs haven't been as I could wish them to be. The bank is taking over all my property. You had better go to Bancroft, Idaho, and receive your sheep. O. J. Carter has them in charge. I have instructed him to turn them over to you. Take camp, team of horses and set of harness with them.

"I am sorry I haven't enough sheep to pay you in full. Hope to make them good some day.

"They are all young ewes, and much better grade of sheep than what I received from you. They are straight ewes and no lambs with them. Hand this letter to O. J. Carter, Bancroft, Idaho.

"Yours resp.,
"ARTHUR NAYLOR."

To this letter was also attached the following direction to O. J. Carter, who appears to have been in charge of the sheep for Naylor:

"Mr. O. J. Carter,

"Dear Nephew: Turn all sheep we have over to Mr. Woolley, with camp, team of horses and set of harness.

"Yours resp.,
"ARTHUR NAYLOR."

The record shows that respondent began lending money to Naylor in 1908, and that various amounts of money were loaned to him, reaching at one time the sum of $75,000. Naylor appears to have been handling a large number of sheep during this time and to have had about 11,000 head of sheep within two months of the time at which he turned over the sheep in controversy to Woolley. There is no showing that either Woolley or Naylor ever made any representations to the bank with regard to the particular sheep received by Naylor from Woolley; nor is there any showing that the bank had any knowledge whatever of the contract between Naylor and Woolley. The credit extended by the respondent to Naylor is shown to have been given not alone upon sheep, but upon other assets. It is fair to infer, however, from

the record that Naylor was doing a reasonably successful business as a sheepman, and that he had corresponding credit with the respondent on that account. The respondent at no time, so far as the record shows, had a lien of any character on the sheep that were being handled by Naylor. Naylor, so far as respondent was concerned, appeared to be perfectly free to buy and sell as he pleased, and there is no claim that any of the statements made to respondent on which it claims to have relied were false in any particular.

More than two weeks after Naylor had delivered the sheep to Woolley, in settlement, so far as a settlement at that time could be made, of the contract between them, and after title had passed to Woolley, the respondent caused the attachment to be levied upon the sheep in controversy.

Respondent rests its claim to the sheep in controversy upon C. S., sec. 1955, which reads as follows:

"All leases of more than 10 head of livestock must be in writing and must be acknowledged in like manner as grants of real property, and filed of record in the same county recorder's office or offices, and within the same time and manner, and for the same fee, as are chattel mortgages; and the failure to comply with the provisions of this section renders the interest of the lessor in the property subject and subsequent to the claims of creditors of the lessee, and of subsequent purchasers and encumbrancers of the property in good faith and for value."

Respondent relies upon the case of *Hare v. Young*, 26 Ida. 682, 146 Pac. 104, but it has not brought itself within the holding of this court in that case. There the parties claiming ownership of the sheep had leased them to Young and permitted him to handle them as his own without recording the leases, but the sheep had been mortgaged to Anderson Brothers Bank to secure a loan obtained by Young before the owners set up a claim to possession of the sheep. This mortgage had been assigned to plaintiffs in that case, and it was in the foreclosure action that the claim of ownership was unsuccessfully asserted.

It is the contention of respondent in this case that under the facts shown here a general creditor, such as respondent, would have a right to levy upon these sheep in the hands of Woolley. To this proposition we cannot assent. The term "creditor" as used in C. S., sec. 1955, does not refer to a general creditor, but to one who has acquired some sort of lien, by attachment or otherwise, upon the property. This construction was given by this court to language similar to that used in C. S., sec. 1955, in the case of *Martin v. Holloway,* 16 Ida. 513, 102 Pac. 3, 25 L. R. A., N. S., 110. Respondent, not being such a creditor as the statute contemplates, could not acquire any valid claim to the sheep that had previously been turned over to Woolley in part settlement of Woolley's claim under the contract between himself and Naylor.

We think there is no doubt that the contract between Naylor and Woolley, as between themselves, was valid and enforceable at law. Naylor was in possession of these sheep and had a legal right to dispose of them as he did by turning them over to Woolley in settlement, or part settlement, of his obligations under the contract between them. When he did so, title vested in Woolley and respondent had no more legal right to complain than it had to complain of the sale or disposition which had taken place with regard to more than 9,000 of Naylor's sheep within the preceding sixty days. The seizure of these sheep under attachment was wholly unwarranted and without right.

The trial court erroneously denied appellant an opportunity to introduce evidence as to the value of the sheep in controversy; consequently, there is no finding on that point to determine the issue raised by the complaint in intervention and the answer thereto. It will be necessary, therefore, if the sheep cannot be delivered to the intervenor, to take further evidence to determine the value of the sheep.

The judgment is reversed and the trial court directed to enter judgment that the intervenor was, at the time of the attachment, the owner of the sheep in controversy and entitled to their possession; that the attachment be discharged

and the sheep be returned to the intervenor. If their return is not possible, the trial court is directed to take evidence as to their value and make a finding thereon, and thereupon to enter judgment in behalf of the intervenor and against the respondent for such value, with interest thereon from the date of the attachment, December 30, 1920, and costs. Costs on appeal awarded to appellant.

Budge and Wm. E. Lee, JJ., concur.

McCarthy, C. J., and William A. Lee, J., dissent.

WILLIAM A. LEE, J., Dissenting.—This was an action by respondent bank to recover judgment on notes aggregating $20,000 executed by defendant Arthur Naylor, and 1,381 head of sheep were attached as the property of defendant. Thereafter Lorin C. Woolley intervened and claimed title to these sheep. Naylor defaulted and respondent took judgment for the indebtedness represented by the notes. The action between the intervenor and respondent resulted in a judgment for respondent, the court holding that the sheep in question were the property of Naylor when attached, and dismissed the complaint in intervention, from which judgment this appeal is taken.

Appellant claims ownership in the attached animals by reason of an agreement made between defendant Naylor and John W. Woolley at Vernal, Utah, in October, 1908. This agreement, which was in writing but not signed by either party, provided that Woolley was to deliver 1,450 head of sheep to Naylor, by him to be shorn and dipped and in all respects cared for at his expense, except taxes were to be paid by Woolley, and was to run for a year. At the expiration of the year appellant delivered to Naylor an additional 35 head of sheep upon the same terms that Naylor had received the first allotment. This agreement was not acknowledged or recorded in Utah where made or in Idaho where the sheep were subsequently taken and no other writing was ever entered into between the parties.

The lower court made complete findings of fact, all of which are supported by the evidence. Among other things, it found that neither John W. Woolley nor his son, Lorin C. Woolley, appellant in this case, ever had any agreement in writing with Naylor other than the one mentioned made at Vernal, Utah, in 1908; that there was never at any time a lease of said sheep in writing executed by either of the parties, but that the Woolleys permitted Naylor to keep the sheep in his possession and control from year to year; that Naylor took the sheep from Utah to Idaho and never thereafter returned to Vernal, Utah, and that there was no increase added to the sheep; that neither of the Woolleys ever paid any further attention to these sheep but permitted Naylor to handle them as if they were his own; that he branded them with his brand and from 1909, the time of his removal to Idaho, until the commencement of this action in 1920, he purchased and raised a large number of sheep, running them upon the public range during the open season and keeping them about his premises at Bancroft, Idaho, during the feeding season.

After Naylor's removal to Idaho there was never any settlement between him and the Woolleys except that he made occasional remittances to them purporting to be on account of wool taken from these sheep; the Woolleys never made any effort to identify their sheep or to place any marks or brands on them or to have any accounting regarding the increase or the wool taken from these sheep; that shortly prior to the commencement of this action Naylor requested his herders to turn over all of his sheep to John W. Woolley, but none of the sheep so turned over were any of the original sheep delivered by the Woolleys in 1908 at Vernal, Utah, or the progeny of such animals, and that the Woolleys were not the owners of the sheep attached in December, 1920, by respondent. It appears that respondent bank during all of this time from 1908 to the commencement of this action in 1920 made frequent and at times large loans to Naylor, amounting sometimes to $75,000; that Naylor obtained this money by representing that he was the owner and in control

of all of the sheep in his possession in and about Bancroft, Idaho, and that the same were free and clear from all adverse claims or liens of any kind whatsoever; that respondent relied upon these representations and was thereby induced to make these loans, and at no time had any knowledge or information sufficient to put it upon inquiry that the Woolleys or any other person had any claim upon Naylor's sheep; that Naylor was in debt to respondent bank at the time of the commencement of this action upon the notes sued on in an amount approximating $20,000. As a conclusion from the facts found by the court it held that the Woolleys were not entitled to the possession of the sheep and were estopped from claiming any right or ownership in them.

The controlling question in this case is this: Can appellant, Lorin C. Woolley, who acquired the interests of his father, John W. Woolley, assert ownership in these sheep against respondent by virtue of the agreement made between the Woolleys and defendant Naylor at Vernal, Utah, in 1908 and 1909?

In 1907 the legislature of this state recognized the opportunity for fraud if secret leases were to be recognized and passed what is now C. S., sec. 1955, which is as follows:

"Sec. 1955. *Leases to be in writing and recorded.* All leases of more than 10 head of livestock must be in writing and must be acknowledged in like manner as grants of real property, and filed of record in the same county recorder's office or offices, and within the same time and manner, and for the same fee, as are chattel mortgages; and the failure to comply with the provisions of this section renders the interest of the lessor in the property subject and subsequent to the claims of creditors of the lessee, and of subsequent purchasers and incumbrancers of the property in good faith and for value."

It will be noted that the legislature has used the words "claims of creditors," not "claims of lien creditors." The language of this statute is so plain, simple and clear that under the well-settled rules of construction, to which there

are no exceptions, there is no occasion nor is it permissible to interpolate into this statute, as the majority opinion has done, the word "lien" preceding the word "creditors." (*In re Segregation of School District No. 58*, 34 Ida. 223, at p. 228, 200 Pac. 138; *State v. Jutila*, 34 Ida. 595, 202 Pac. 566.)

In *Holmberg v. Jones*, 7 Ida. 752, 65 Pac. 563, this court cited with approval Endlich upon Interpretation of Statutes, which at sec. 8 states the rule: "The court knows nothing of the intention of an act, except the words in which it is expressed, applied to the facts existing at the time."

36 Cyc., p. 1106, states the rule to be:

"The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the legislature. This intention, however, must be the intention as expressed in the statute, and where the meaning of the language used is plain, it must be given effect by the courts, or they would be assuming legislative authority."

In R. C. L., p. 972, it is said:

"And it is an invariable rule that an exception cannot be created by construction where none is necessary to effectuate the legislative intention. The power to create exceptions by construction can never be exercised where the words of the statute are free from ambiguity and its purpose plain. . . . . The courts have no dispensing power over statutes. Where statutes contain no exceptions, and it cannot be said with certainty that exceptions were contemplated by the legislature, the courts can recognize none."

The majority opinion says, "The term 'creditor' as used in C. S., sec. 1955, does not refer to a general creditor but to one who has acquired some sort of lien, by attachment or otherwise, upon the property." The legislature says, "claims of creditors," not "claims of lien creditors." The language of this statute is so plain that it leaves no room for interpretation and its purpose cannot be misunderstood. For this court to interpolate the word "lien" preceding the word "creditors" and thereby make it read "lien creditors" is a plain disregard of the legislative intent. Where

a court interpolates into a statute a word or words that changes the obvious meaning of the statute it not only violates all well-settled rules of construction but it is plainly a refusal on the part of the court to obey the legislative mandate, and amending this statute by judicial construction is a plain usurpation of a legislative function.

In the instant case the Woolleys in 1908 and 1909 delivered to Naylor about 1,500 head of sheep at Vernal, Utah. What became of those animals or their increase is a matter of speculation. It is known, of course, that neither the sheep turned over to Naylor nor any of their increase are the same sheep that appellant received from Naylor in 1920.

In paragraph 7 of his petition appellant alleges that Naylor was not at any time the owner of said sheep and was without authority at all times to mortgage, sell or otherwise dispose of them and that at all times up to and including the fourteenth day of December, 1920, appellant was the absolute owner of said sheep together with the increase thereof. In paragraph 10 of his petition he alleges that on December 14, 1920, he personally repossessed these sheep in Bannock county, Idaho, and that he was the absolute owner as against all the world and now is. Therefore there can be no question but that appellant's claim to these sheep is that of absolute ownership, which claim of ownership is based upon the delivery of the sheep to Naylor in 1908 and 1909 at Vernal, Utah, and that this ownership continued from that time until he repossessed them at Bancroft, Idaho, in December, 1920, and the majority opinion upholds this claim. There is no question before this court of Naylor being indebted to the Woolleys by virtue of this agreement made at Vernal, Utah, or of appellant taking the sheep in question in payment of any such indebtedness.

The holding in the majority opinion that a claim of ownership based upon a secret lien made in another state, not in accordance with the laws of that state and in direct violation of the law of this state, will be sustained, invites the perpetration of the most flagrant frauds and will tend to destroy all basis for the extension of credits to those en-

gaged in the livestock business in this state; it nullifies the leasing statute and restores the opportunity for dishonesty that this act was intended to prevent.

The majority opinion says, ''Respondent, not being such a creditor as the statute contemplates, could not acquire any valid claim to the sheep that had previously been turned over to Woolley in part settlement of Woolley's claim under the contract between himself and Naylor.'' As clearly appears from appellant's pleading which we have referred to, he did not take these sheep because he was a creditor or had any claim against Naylor as a creditor, but, on the contrary, took them under a claim that the title to these sheep in the possession of Naylor during all these years was in the Woolleys.

The majority opinion says, ''This construction [that the word 'creditors' as used in the statute means 'lien' creditors] was given by this court to language similar to that used in C. S., sec. 1955, in the case of *Martin v. Holloway*, 16 Ida. 513, 102 Pac. 3, 25 L. R. A., N. S., 110.'' In that case a chattel mortgage on a stock of merchandise contained in a building on Main Street, in Boise, stipulated that the mortgagor might remain in possession, sell the stock and apply the proceeds on the mortgage indebtedness. Subsequently by agreement of the parties the mortgagee took possession before the mortgage had become due, and the court held that the taking of possession cured the objectionable stipulation in the mortgage as against subsequent attaching creditors. In the instant case the debtor Naylor, after his removal to Bancroft, Idaho, in 1909, exercised all the rights of ownership over his flocks of sheep until December, 1920. He branded them with his brand, sold them and bought and raised others to take their place, they were assessed to him upon the public tax-rolls and he paid the taxes, marketed the wool shorn from them, and during all of this time had them in his sole and exclusive possession. Under these circumstances I cannot perceive how the rule announced in the Holloway case can be extended to support the majority opinion which holds that notwithstanding these facts the Woolleys were during all of this time vested with

the title to an equal number of Naylor's sheep which they could assert at any time against his creditors.

The finding and holding of the lower court that appellant should be estopped from asserting title to these sheep is based upon the soundest principles of law and justice.

The Woolleys during all of this time neglected to have their agreement with Naylor renewed and recorded as the law requires (*Hare v. Young*, 26 Ida. 682, 146 Pac. 104), and their failure and neglect to comply with the law in the matter of having their lease properly executed and recorded was such a flagrant violation of the law that they should be estopped from asserting title to these sheep.

I am authorized to say that Mr. Chief Justice McCarthy concurs with me in dissenting from the views expressed in the majority opinion.

Petition for rehearing denied.