## HOWELL v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10793.

Circuit Court of Appeals, Fifth Circuit.

Feb. 8, 1944.

Robert Ash, of Washington, D. C., for petitioner.

F. E. Youngman, Sewall Key, Harry Baum, and A. F. Prescott, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and B. D. Daniels, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before HOLMES, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The Commissioner of Internal Revenue contended, and the Tax Court found, that the petitioner's deceased husband had not held an oil and gas lease for more than eighteen months prior to its sale and, therefore, was not entitled to the deduction allowable in computing long-term capital gains under Section 117 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 117.[1]  This appeal results.[2]

On October 6, 1937, one Ferguson en-

---

[1] "(a) (2) Short-term capital gain. The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 18 months, if and to the extent such gain is taken into account in computing net income;

\*　　　\*　　　\*　　　\*　　　\*

"(4) Long-term capital gain. The term 'long-term capital gain' means gains from the sale or exchange of a capital asset held for more than 18 months.

\*　　　\*　　　\*　　　\*　　　\*

"(b) Percentage taken into account. In the case of a taxpayer, other than a cor-

tered into a contract with Howell, who will be hereafter referred to as "the taxpayer", whereby the former agreed to execute and deliver an oil and gas lease to the taxpayer provided the taxpayer would begin drilling for oil on the land on or before the 21st day of November, 1937. Two instruments were prepared and executed on October 6, 1937. The contract contained the following material provisions:

"Now, Therefore, for and in consideration * * * said First Party agrees to execute and place in escrow in the First National Bank of Wichita Falls, Texas, oil and gas lease covering the above described tract of land, in favor of said second party; and said Second Party hereby agrees that he will, on or before the 21st day of November, 1937, commence the actual drilling of a well on the tract of land above described, said well to be drilled with due diligence to a depth of 4000 feet, or to a sufficient depth to test what is known as the K-M-A deep sand. * * * "

"The lease mentioned herein is to be for a period of three years, with annual rental of $1 per acre; and said lease is to be delivered to said second party at the time said well is actually started."

The oil and gas lease mentioned in the contract was, on the same day, executed to the taxpayer as lessee, conformable to the foregoing provisions of the contract, and also required lessee to commence actual drilling of a well on or before November 21, 1937. The lease was placed in escrow with one Gray, as escrow agent, who was instructed to return the lease to the lessor if no well was actually started on or before November 21, 1937. It was also agreed that if the well were started on or before November 21, the written lease would be delivered to lessee, and Gray, the escrow agent, was thereupon to become the owner of the mineral rights on 20 of the 516 acres involved. The fact that the escrow agent was an interested party was known to lessor and lessee.

On October 26, 1937, the taxpayer entered into an agreement with Consolidated Oil Company whereby he agreed to convey to Consolidated an undivided 3/4 interest in the acreage covered by the contract with Ferguson, in consideration of the payment of $5,000 cash and the assumption by Consolidated of all Howell's obligations under the Ferguson contract. The drilling of a well was begun on November 16 or 17, 1937, and on the same day the escrow agent, Gray, delivered the written lease to Howell, who, on the same day, conveyed an undivided 3/4 interest in the lease to Consolidated Oil Company, and on the same date an assignment was made to Gray of the mineral rights in the 20 acres aforementioned.

On April 10, 1939, the taxpayer and Consolidated Oil Company sold their combined interest in the lease to certain portions of the land to Buffalo Oil Company for $700,-000 cash. The taxpayer's net profit out of the transaction was $160,146.67. Taxpayer and his wife, on the community property basis, reported only 66⅔ per cent of the profit derived from said sale as taxable income, on the theory that the profit so reported represented a long-term capital gain derived from the sale of a capital asset held for more than 18, but less than 24, months. The Commissioner and the Tax Court determined that the amount reported represented a short-term capital gain, taxable to the extent of 100 per cent.

The question is whether or not the taxpayer, on April 10, 1939, when he sold the interest to Buffalo Oil Company, had held his interest in this capital asset for more than 18 months. If he was not the owner of the thing sold on or before October 10, 1937, he, of course, could not have held same for more than 18 months. The original contract was dated October 6, 1937, but drilling did not begin, and the lease was not delivered, until November 16 or 17, 1937. Taxpayer insists that his rights in the asset were acquired on October 6, 1937, the day of the contract. The Commissioner contends, and the Tax Court found, that the taxpayer did not acquire ownership in the asset prior to November 16 or 17, 1937.

The statute uses the language "asset held for more than 18 months", but it

poration, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

"100 per centum if the capital asset has been held for not more than 18 months;

"66-2/3 per centum if the capital asset has been held for more than 18 months but not for more than 24 months;"

2 The appeal involves not only the liability of Katie M. Howell, individually, but also her liability as executor, etc., of the Estate of J. H. Howell. Cases Nos. 10793 and 10794 were consolidated.

has been determined that to hold property is to own it. McFeely v. Commissioner, 296 U.S. 102, 56 S.Ct. 54, 80 L.Ed. 83, 101 A.L.R. 304, and Helvering v. San Joaquin Company, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824. The answer to the main question will be found in the date that the ownership of the lease by the taxpayer began, for it is the holding of an owner, as distinguished from the holding of a bailee or trustee, that is contemplated by the statute.

The contract of October 6 was a contract to make a contract—that is, to make and deliver a lease. In it the landowner agreed to execute and place in escrow an oil and gas lease. The lease was to be for a period of three years with an annual rental of $1. per acre, but which lease was to be delivered at the time drilling was started on the well. The lessee agreed that he would, on or before the 21st day of November, 1937, commence the actual drilling of a well on the tract of land. The lease was written, signed, and placed in escrow on the same day that the contract was executed, but the landowner's contract to execute a lease was to take effect if and when drilling had begun on the well prior to the expiration of the 21st day of November. Not only did the contract contemplate delivery as essential to the written instrument, but so does the law. The lease in question was only conditionally delivered on the 6th day of October. The contract of October 6 was simply a contract to make a lease and to authorize the taxpayer to go upon the lands to explore and to prepare to drill the well, in the event he should decide to drill. The escrow agent was instructed to return the written instrument to the landowner in the event no well had been started on the premises on or before November 21.

The beginning of a well on, or prior to, November 21 was a condition precedent to the vesting of a lease-hold interest in the taxpayer. All rights of the taxpayer would have vanished at midnight on the 21st day of November if no drilling had then started. The only right of the landowner to become fixed prior to the beginning of drilling was the right to go upon the land for purposes preparatory to the initiation of drilling operations. The fact that a separate contract was drawn and executed at the same time as the lease indicates that the lessor did not intend that any ownership of the gas and oil should pass to the taxpayer immediately. If the intent and purpose of the parties had been the contrary, there would have been no necessity for the execution of a contract for a lease. Evidently aware of the Texas law that an oil and gas lease operates as a present sale of the oil and gas in place, the lessor was unwilling to execute to the taxpayer a present sale of oil and gas prior to the performance of stated conditions precedent.

Taxpayer contends that one who acquires the right to enter upon the land to explore for oil and to commence drilling becomes the owner of an "economic interest" at the time of making of the contract giving him such rights. Under the law of Texas an oil lease is a present sale of oil and gas in place. That is the substance of what taxpayer acquired when the lease in question was delivered. That is what the taxpayer sold to Buffalo Oil Company. The purchasers did not pay $700,000 for an "economic interest". They paid $700,000 for oil and gas in place, plus the right to take it, as evidenced and made secure to them by the execution and delivery of a valid and legal document, to-wit, a lease. It seems to matter little in this case as to what the taxpayer's right is called, that is, whether it be called an "economic interest", a "a contract", or "a lease", or "a sale", but the question is, *when* did the taxpayer acquire the thing which he sold for which he received the profit here sought to be taxed, rather than *what* the thing should be called. The taxpayer, who entered into a contract to make another contract, insists that such contract-to-make-a-contract vested in him an economic interest on the 6th day of October, 1937. But all that he had on that day was a contractual right to have a lease issued to him if and when he should comply with the terms and conditions of his contract. Taxpayer fails to recognize the difference between the absolute and the conditional. Prior to the starting of the well the lease was purely conditional, and would become absolute upon the compliance with the conditions. The parties traded with this thought in view. Taxpayer, doubtless, had this thought in mind when he made a contract of sale of a portion of his interest in the contract to the Consolidated Oil Company before the lease was delivered and then, upon the delivery of the lease, made an absolute assignment of the interest he had theretofore contracted to sell. In Norman v. Wilson, 41 S.W.2d 331, the Court of Civil Appeals of Texas, Austin Division, held that a grantee was not en-

titled to delivery until he had fulfilled the conditions imposed by the escrow agreement, and that the placing of a conveyance in escrow to be delivered upon the performance by the grantee of certain conditions passed no title to the property until delivery.

It is next urged that Gray, the escrow agent, was the potential owner of a leasehold interest in 20 acres of the land in question and, therefore, Gray was a co-owner of co-tenant, and that a delivery to one owner was a delivery to all. To argue this is to ignore both the law and the facts. In the first place, Gray was holding the instrument as an agent, to whom it had been committed as a matter of trust, and not as an owner or a potential owner. The lease was placed in his possession and custody to be kept according to the agreement of the parties, each of whom evidently had confidence in his integrity, but had he been a man of evil act and purpose, the law would not have permitted him to obtain the possession of a document as an escrow agent and then to set up his possession of the document in support of a claim adverse to his principals. Gray received delivery of the lease as escrow agent and in no other capacity.

The taxpayer, prior to November 16 or 17, 1937, was not the owner of the capital asset in question and, therefore, was not entitled to have the profits realized therefrom in a sale occurring within less than 18 months computed as a long-term capital gain.

The decision of the Tax Court is affirmed.