F. C. VAUGHAN AND MATTIE VAUGHAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57161–57164, 69942–69944. Filed May 24, 1961.

---

[1] Proceedings of the following petitioners are consolidated herewith : Floyd C. Vaughan, Docket No. 57162 ; Floyd C. and Katherine D. Vaughan, Docket No. 57163 ; P. W. Vaughan, Docket No. 57164 ; P. W. Vaughan, Docket No. 69942 ; F. C. Vaughan and Mattie E. Vaughan, Docket No. 69943 ; and Floyd C. and Kathryn L. Vaughan, Docket No. 69944.

*Ralph R. Bailey*, *Esq.*, and *Frank E. Magee*, *Esq.*, for the petitioners.

*John D. Picco*, *Esq.*, for the respondent.

358

## OPINION.

BLACK, *Judge:* Petitioners contend that the proceeds of all sales of cows, bulls, and heifers during the term of their agreement with Milford are taxable as capital gains derived from the sale of animals held for breeding purposes within the meaning of section 117(j)(1) of the Internal Revenue Code of 1939.[3]

Respondent first contends that the agreement between the partnership and Milford was a lease, creating a lessor-lessee relationship, and consequently that any income derived by the partnership thereunder must necessarily be ordinary income. It was not. The income which the partnership derived was the product of the sale of animals, not the product of the agreement (regardless of the label applied to the agreement). It is true that had Milford been obligated to pay the partnership rent for the use of the cattle, such rental payments would constitute ordinary income but we can find no such obligation in the agreement. The only duty which the agreement placed upon Milford

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B), property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a)(1),(C). Such term also includes timber or coal with respect to which subsection (k)(1) or (2), is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry. [The last two sentences were added by section 324 of the 1951 Revenue Act.]

as to the payment of money was the duty to transmit to the partnership one-half of the proceeds of sales of cattle. We hold, therefore, that the amounts in question were not ordinary income arising as rentals from a lease, but constituted, rather, proceeds of sales of cattle, the taxable nature of which must be taxed as proceeds of sales.

By the agreement with Milford, petitioners gave possession and control of the herd to Milford and agreed to share certain range and other expenses. In return, Milford agreed to run the herd, feed it, provide labor necessary to operate it, and to share certain expenses. Milford was given powers to sell cattle in his discretion, and the proceeds of such sales were to be divided equally between petitioners and Milford.

Such contracts are variously referred to as leases, partido agreements,[4] bailments,[5] or agistments.[6] By whatever name they are known, they bear aspects of rental agreements, bailments for mutual benefit, and management contracts. The proportion of these aspects necessarily varies with each agreement and in accordance with the interpretation given them by the courts of appropriate jurisdiction.

It is clear that under Idaho law the owner of livestock is not divested of his ownership of animals transferred under such an agreement.[7] It is also clear that the other party to such an agreement (by whatever label he be designated) acquires an undivided interest (in the present case, a one-half interest) in the increase at birth.[8] Although the lessee is the apparent owner of the animals, in that he has custody and control of them, recording of the agreement in accordance with State statute [9] prevents fraud upon subsequent secured creditors of the lessee, and preserves the owner's interest.[10] Therefore, under applicable State law, petitioners owned the cattle transferred under the agreement, and an undivided one-half interest in the increase. Likewise, it would seem they had an undivided one-half interest in any accretions to the herd.

Thus, petitioners were the owners of the cattle or interests therein. Respondent's contention that petitioners did not "hold" these cattle or interests in the cattle within the meaning of section 117(j)(1) is not supportable. "In common understanding to hold property is to own it." *McFeely* v. *Commissioner*, 296 U.S. 102 (1935). The holding period begins with acquisition of property and not with its conversion to a particular use. *Kay Kimbell*, 41 B.T.A. 940 (1940). The holding of the owner is not defeated by the custody or possession of a bailee

---

[4] *Martinez* v. *Garcia*, 43 Ariz. 243, 30 P. 2d 501 (1934).

[5] *Mahoney* v. *Citizens Nat. Bank*, 271 Pac. 935 (S. Ct. Idaho 1928).

[6] *Arrington Bros. & Co.* v. *Fleming*, 117 Ga. 449, 43 S.E. 691 (1903).

[7] *Continental Nat. Bank of Salt Lake City* v. *Naylor*, 39 Idaho 267, 228 Pac. 266 (1924) ; *Price* v. *Grice*, 10 Idaho 443, 79 Pac. 387 (1904).

[8] *Mahoney* v. *Citizens Nat. Bank*, *supra*.

[9] Idaho Code, sec. 25–2001.

[10] *Continental Nat. Bank of Salt Lake City* v. *Naylor, supra; Hare* v. *Young*, 26 Idaho 682, 146 Pac. 104 (1915).

for the custody or possession by a bailee or trustee does not commence the running of the bailee's or trustee's holding period. *Howell* v. *Commissioner*, 140 F. 2d 765 (C.A. 5, 1944). Even if petitioners had given Milford an option to purchase the cattle at the end of the lease, the interest of the optionee does not commence the running of his holding period by any theory of relation-back so as to defeat petitioners' holding. *Helvering* v. *San Joaquin Fruit & Investment Co.*, 297 U.S. 496 (1935).

It is stipulated that petitioners owned the cattle prior to the agreement with Milford. It is clear that, under Idaho law, petitioners did not divest themselves of their ownership of the cattle leased. Necessarily it follows that they held the cattle during the years in issue.

Respondent next contends that the partnership did not hold the animals operated under the agreement for breeding purposes. In this regard he argues that the animals were held either for lease or hire, or for sale to customers in the ordinary course of business.

The contract between the partnership and Milford was called a "lease agreement," referred to the parties as "lessors" and "lessees," and was generally couched in language similar to that used in rental agreements. As previously noted, however, the agreement imposed upon Milford no obligation to pay any rent. More important, it seems clear that the agreement contemplated continued operation of the herd and required operation of the herd as an operating cattle unit. Although the agreement specifically disavows any intent to create a partnership between Vaughan Bros. and Milford, it likewise specifies that Milford's operations shall be those of an independent contractor. In this respect the agreement most nearly resembles a management contract in which Milford undertook to operate the herd for the partnership, supplying feed, range, and labor in return for a share of the proceeds of sales of cattle. Thus, we are satisfied that during the years in issue the partnership, Vaughan Bros., held the cattle for purpose of operation as a ranch and range herd and not for lease or hire.

Respondent's argument that some of the cattle, the sale of which produced the income here in issue, were not held by the Vaughan partnership for breeding purposes, but were rather held for sale to customers in the ordinary course of business is of merit. As set forth in our Findings of Fact, many heifers were in fact sold during the years of operation under the agreement to permit Milford sufficient funds, including funds from the sale of steers, for continued operation. In the first year of operation the amount realized by the sale of heifers exceeded the amount derived from steer sales. Over the life of the agreement, heifer sales equaled 30 percent of the total derived from the sale of animals, and 60 percent of the amount derived from the sale of steers.

Petitioners argue that it was the intent of Vaughan Bros. and of Milford to endeavor to retain as many heifers as possible that the size of the breeding herd might be increased. Their actions, however, do not manifest such an intent. At the opening of the contract period, there were on hand 306 heifers coming 2 years old and 128 yearling heifers, a total of 434. During the contract period 1,636 heifers were branded, producing a cumulative total of 2,070 heifers available during the contract period for replacement of heifers at the termination of the contract, replacement of cows culled from the herd, and addition to the herd or sale. During the period, 433 cows were culled and sold from the herd. Of the total number of heifers available during the period, 867 animals were required for replacement of cows and original heifers, leaving 1,203 heifers available for sale or addition to the herd. During the period of the contract, 817 heifers, or 67.91 percent of the number of heifers available during the period for sale or addition to the herd, were sold. Although the range could accommodate some 2,100 head of count cattle (during the period of the agreement Milford obtained permission to increase the number of count cattle grazed on the Federal ranges), the number of cattle on hand at the termination of the agreement was only 1,837, a figure appreciably less than the sustaining capabilities of the range.

Petitioners argue that all female cattle were members of the breeding herd from the time of their birth. In this regard they rely upon their intent in holding the cattle, and the fact that they were exposed to the bulls from the time of birth. We have already discussed the matter of their intent, reaching the conclusion that their actions do not coincide with the claimed intent. As to the contention that the heifers were members of the breeding herd because they were exposed to the bulls, it seems clear that such fact standing alone does not support the conclusion which the petitioners urge upon us. Exposure to bulls was a meaningless act, except in rare and exceptional cases, until the heifers were at least 14 months old.

In determining whether the heifers were a part of the breeding herd or held primarily for sale to customers, we find it significant that essentially the only criterion applied in determining at the fall beef roundup which heifers were to be sold was whether they were so obviously pregnant as to render them unattractive to the buyers of slaughter or feeder animals. The number of heifers sold each year was determined by the anticipated requirement by Milford of operating funds for the coming year. The designation of the particular animals to be sold was based upon a determination of which animals buyers would purchase.

It is well settled that the sale of animals culled from the breeding herd of a beef cattle operation results in capital gains under section 117(j)(1) of the 1939 Code, rather than ordinary income. *United*

*States* v. *Bennett*, 186 F. 2d 407 (C.A. 5, 1951) ; *Albright* v. *United States*, 173 F. 2d 339 (C.A. 8, 1949) ; *Fawn Lake Ranch Co.*, 12 T.C. 1139 (1949). Similarly, the sale of an entire breeding herd of beef cattle produces capital gains rather than ordinary income. *Franklin Flato*, 14 T.C. 1241 (1950). The problem lies in determining whether the animals, the sale of which produced the disputed income, were in fact members of the breeding herd. *Biltmore Company* v. *United States*, 228 F. 2d 9 (C.A. 4, 1955) ; *Gotfredson* v. *Commissioner*, 217 F. 2d 673 (C.A. 6, 1954), affirming a Memorandum Opinion of this Court; *Walter S. Fox*, 16 T.C. 854 (1951), affd. 198 F. 2d 719 (C.A. 4, 1952).

"The determination of which animals, if any, were held by the petitioners for breeding purposes is essentially a question of fact," *Estate of C. A. Smith*, 23 T.C. 690, 706 (1951). Although such factors as the ultimate use of the animals, their age, and the regularity of sales bear upon the matter, the important thing is no single factor or combination of factors, rather it is the purpose for which the animals are held. Sec. 117(j)(1), 1939 Code; *Fox* v. *Commissioner*, 198 F. 2d 719, 722.

The facts here show that customarily heifers commenced breeding when 14 or 15 months old. The gestation period was 9 months. At any time during the period from 14 to 24 months, the heifers were subject to sale if not visibly pregnant. Animals over 24 months old were kept either because they were pregnant at the time of the fall sales, or because they appeared especially valuable replacements for the herd. As in the *Fox* case the record presents insufficient facts from which we may precisely ascertain the purpose for which each heifer sold was held prior to sale. We are left then only with the possibility of determining that intent in terms of the age of the heifers, and we hold, as we have set forth in our Findings of Fact, that heifers over 24 months of age were held for breeding purposes and that all younger heifers were held primarily for sale to customers in the ordinary course of business.

From our discussion above, and as set forth in our Findings of Fact, the sale of cows culled from the breeding herd and of bulls used for breeding purposes constituted sales of animals used for breeding purposes which the partnership had held for the requisite time, and petitioners' appeal as to the proceeds of these sales is sustained.

As stated in respondent's brief:

It is manifestly apparent that the same conditions prevailed in 1951 as previously existed with respect to the heifer sales in 1948, 1949, and 1950. It follows therefore that the same conclusions should also apply with respect to the heifer sales in 1951.

We agree with this statement, have so found, and do accordingly so hold.

*Decisions will be entered under Rule 50.*